**146**

FIRST CITY NATIONAL BANK OF EL PASO, Plaintiff,

v.

UNITED STATES of America and Mardoqueo M. Alfaro, a/k/a Alfaro M. Mardoqueo, Mardoqueo Alfaro, Alfaro Mardoqueo and Mario Molina, Refugio Chavez Moreno, Santiago Monzon Araujo, Anselmo Chavez Moreno, Jose Maria Chavez Moreno, Juan Huerta Trejo, Justo Chavez Moreno, Rosario Galaviz Gamez, Jaime Galicia Mendez, Nabor Astorga Molina, Crisostemo Galaviz Gamez, Rosario Gastelum Payan and Leticia Corona S., Defendants.

No. EP–84–CA–231.

United States District Court,
W.D. Texas,
El Paso Division.

Nov. 8, 1984.

Victor F. Poulos, El Paso, Tex., for plaintiff.

Mark M. Greenberg, Asst. U.S. Atty., El Paso, Tex., Michael E. Greene, Tax Div., Dept. of Justice, Dallas, Tex., Alfred W. Ricciardi and Merwin D. Grant, Phoenix, Ariz., John B. Luscombe, Jr., El Paso, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

HUDSPETH, District Judge.

On June 25 and June 28, 1984, the Internal Revenue Service, acting pursuant to the authority of 26 U.S.C. § 6851, terminated the 1984 tax year of Mardoqueo M. Alfaro, and assessed income taxes totaling $28,341,706.00. In the form of a cross-claim in an interpleader action, Alfaro seeks to challenge pursuant to 26 U.S.C. § 7429 both the reasonableness of the termination assessment and the appropriateness of the amount.

On June 21, 1984, Special Agent Robert Paiz of the Drug Enforcement Administration in Santa Ana, California, received information from a confidential informant that a Latin couple registered under the name "Avendano" in Room 241 of the Anaheim Travelodge were engaged in some type of narcotic transaction. Investigation by Agent Paiz verified that a "Federico Avendano" was registered in Room 241; –that the couple had paid cash in advance for the room, and that at least one international phone call had been made and charged to that room. No activity was observed on June 21, so surveillance was discontinued. The following day, however, surveillance agents saw a 1984 Volkswagen with dealer tags arrive at Room 241, and a Latin female with a small child got out of the car, opened the door with a key, and entered the room. When she came out again, agents followed her to Room 221 of another Anaheim motel called the Convention Center Inn. The agents then established surveillance on the second motel. Examination of the records of the Convention Center Inn revealed that Room 221 was registered to "Carlos Valdez" of Guadalajara, Mexico; Room 222 was registered to Alfaro Mardoqueo of Guadalajara, and Room 335 was occupied by "Avendano."

As surveillance continued on the Convention Center Inn, the agents observed a male individual emerge from Room 221 with a brown cardboard box. He placed the box in a 1975 Volkswagen and drove away. The agents followed the Volkswagen to the San Diego Freeway, and observed that the driver turned north toward Los Angeles. As the agents followed the vehicle on the Freeway, they observed that it changed lanes frequently and drove "erratically." The agents decided to stop this vehicle and to question the driver. Upon questioning, the driver stated that his

name was Carlos Felix-Sanchez; that he was from Mexico; that he was in California on a "social visit," and that he was staying in Anaheim at Room 335 of the Convention Center Inn. The cardboard box which Felix had removed from Room 221 and placed in his vehicle contained a sophisticated money-counting machine. As the agents drove back toward Anaheim with Felix, he informed them that they would find a lot of money in the motel room.

Upon returning the Convention Center Inn, the agents found the Latin woman previously seen, who gave her name as Ana Luisa Avendano, occupying Room 335. She admitted to being the occupant of Room 241 at the Travelodge also, and she consented to the search of both rooms. In Room 335, the agents found another money-counting machine and two cardboard boxes full of money. The search was expanded to include Rooms 221 and 222. In Room 221, which was occupied by a male individual giving his name as Jesus Guerrero, the agents found more cardboard boxes full of money. A dog trained to detect the odor of narcotic drugs was brought to the motel, and he "alerted" to the containers of money in both Rooms 335 and 221. Guerrero stated that the occupant of Room 222 (whose name was Mardoqueo Alfaro according to registration documents) was not present, and that he could not give the agents permission to take the dog into Room 222. The agents obtained a search warrant for Room 222, and found therein additional large quantities of money, to which the dog again alerted. A total of $4,100,000.00 in United States currency was found in the three motel rooms. In addition, the agents found a deposit slip indicating the deposit of $626,000.00 in currency in the Bank of Coronado of San Ysidro, California on June 21, 1984. The money and records were seized, as were the two money-counting machines. The machines were submitted to the DEA laboratory, where they were "vacuumed" in order to determine whether any narcotic drug residue was present. Laboratory tests were positive for traces of cocaine.

Both Carlos Felix-Sanchez and Jesus Guerrero were arrested on suspicion of dealing in drugs. After his arrest, Felix-Sanchez indicated that he desired to cooperate with the agents. He told them that he had been employed by individuals from Mexico to collect money in California for return to Mexico. He also stated that he had been in Anaheim at the same motel about two weeks before, and that the purpose of that trip was also to collect money for the same people. Felix-Sanchez declined to identify the people for whom these services were being performed, but he stated that the money in question came from "drogas." [1]

The seizure of currency occurred on a Saturday. On Monday or Tuesday, Assistant U.S. Attorney Christine Byrd in Los Angeles was contacted by a California attorney named Charles Garry, who said that he represented Felix-Sanchez and Guerrero, and that the money seized did not belong to them. Garry advised AUSA Byrd that the money belonged to Mardoqueo Alfaro of Guadalajara, Mexico, and that the two individuals arrested were just his agents. Garry further informed Byrd that the 4.1 million dollars seized in Anaheim had been brought into the United States from Mexico in a legal manner, and that it was all intended for deposit in the Bank of Coronado. About this time, the Drug Enforcement Administration received information from confidential informants that Alfaro was involved in a drug trafficking ring that dealt in large quantities of cocaine, heroin, and marihuana, and that the illicit profits of this ring averaged $10,000,000 to $20,000,000 a month.

█ Utilizing the information outlined above, Agents of the Internal Revenue Ser-

---

1. Controversy arose at the evidentiary hearing in this case concerning the meaning of the Spanish word "drogas." There was testimony that the word means "debts" in Spanish, but that it is used as a slang word for narcotics. In view of the other evidence already outlined in this opinion that the money was related to cocaine in some way, the Court will find that Felix-Sanchez used the word "drogas" to mean drugs or narcotics.

vice set out to calculate the federal income taxes owed by Alfaro for the calendar year 1984. Using the estimate of $10,000,000 a month profit for five and three-quarters months (from January 1, 1984 to June 21, 1984), the revenue agents calculated federal income taxes due and owing in the amount of $28,341,706.00. Pursuant to 26 U.S.C. § 6851, a termination assessment was made.[2] The Internal Revenue Service then proceeded to levy on all assets located within the United States in which Alfaro was believed to have an interest. The assets levied upon included approximately 6.5 million dollars in deposits in the First City National Bank of El Paso, Texas.

On July 2, 1984, Plaintiff First City National Bank filed an interpleader action in the 243rd District Court of El Paso County, Texas, asking that court to determine whether the funds on deposit belonged to the United States Government or to Mr. Alfaro and his associates. Defendant United States of America removed the state court action to this Court pursuant to 28 U.S.C. § 1441(a). By way of cross-claim, Defendant Alfaro promptly challenged the termination assessment.

A. *Venue.*

Cross-Defendant United States of America first contends that Alfaro's cross-claim should be dismissed because of improper venue. Title 26, United States Code, Section 7429(e) provides that an action for judicial review of a jeopardy or termination assessment "shall be commenced only in the judicial district described in Section 1402(a)(1) or (2) of Title 28, United States Code." The Government argues that under Section 1402(a)(1) an individual, not a corporation, may sue only in the judicial district where he resides, and Cross-Plaintiff Alfaro, a "resident" of Mexico, resides within no judicial district.

■ The short answer to the Government's argument is that Alfaro did not "commence" this action. The action was "commenced" when the Plaintiff, First City

National Bank, filed an interpleader suit in state court. Defendant United States of America then removed the action to federal court, and Defendant Alfaro brought a cross-claim challenging the termination assessment. The doctrine of "ancillary venue" therefore applies, and Alfaro's third-party claim should be considered ancillary for the purpose of statutory venue restrictions. 6 Wright and Miller, *Federal Practice and Procedure* § 1445 (1971). The Government's motion to dismiss for lack of proper venue should be denied.

B. *Reasonableness of Termination Assessment.*

■ The Government has the burden of proving that the making of a termination assessment is reasonable under the circumstances. 26 U.S.C. § 7429(g)(1); *DeLauri v. United States*, 492 F.Supp. 442, 445 (W.D.Tex.1980). That burden is not particularly onerous, however; the standard is somewhat greater than "arbitary and capricious" and somewhat less than "substantial evidence." *DeLauri v. United States, supra; Loretto v. United States*, 440 F.Supp. 1168, 1172 (E.D.Pa.1977). The Court may consider all relevant evidence in determining reasonableness, not just that which was available to the Internal Revenue Service at the time it made the assessment. *DeLauri v. United States, supra; Loretto v. United States, supra* at 1173.

■ Under 26 U.S.C. § 6851(a)(1), a termination assessment may be properly made if the Internal Revenue Service determines

"... that a taxpayer designs quickly to depart from the United States or to remove his property therefrom, or to conceal himself or his property therein, or to do any other act ... tending to prejudice or to render wholly or partially ineffectual proceedings to collect the income tax...."

The Government has sustained its burden of establishing the reasonableness of the

---

**2.** "Termination assessment" means that the taxpayer's tax year was declared at an end, and the income taxes assessed were declared to be immediately due and owing.

termination assessment in this case. Although Alfaro vigorously disputes the IRS conclusion that the funds levied upon were the proceeds of drug transactions, that conclusion is supported by the following evidence:

1. More than four million dollars in United States currency was seized by Agents of the Drug Enforcement Administration at a motel in Anaheim, California at which Alfaro was registered.

2. An associate of Alfaro, one Carlos Felix-Sanchez, admitted that the funds seized were related to drug transactions.

3. Confidential informants of the Drug Enforcement Administration reported that Alfaro belonged to an organization involved in large-scale drug trafficking, and which realized a profit of at least ten million dollars a month.

4. A trained "drug-sniffing" dog detected the scent of drugs on the containers of currency found in the motel room registered to Alfaro.

5. The DEA laboratory found traces of cocaine on the money-counting machines seized at the Anaheim motel.

Furthermore, investigation by the Internal Revenue Service established that Alfaro had made large deposits of currency at various locations within the United States (including the Bank of Coronado of San Ysidro, California, the El Paso National Bank, the First City National Bank of El Paso, and the Tesoro Savings and Loan Association of Laredo, Texas) within the preceding six months. The use of large amounts of currency is a traditional indicator of a desire to conceal the source of funds. Furthermore, within a few days after the seizure at the Anaheim motel, Alfaro and his associates withdrew millions of dollars from institutions located with the United States. For example, more than two million dollars were withdrawn from the El Paso National Bank in El Paso, Texas, converted to currency and disposed of in a fashion which is still unknown.

Several million dollars were withdrawn from the Tesoro Savings and Loan in Laredo, Texas, and were transmitted to Panama by means of a wire transfer. Finally, Alfaro is a citizen of Mexico and resides in Guadalajara, Mexico, outside the boundaries of the United States. For all these reasons, the termination assessments levied on June 25 and June 28, 1984 were reasonable.

C. *Appropriateness of the Amount.*

■ Once the Government bears its burden of establishing the reasonableness of a termination assessment, the burden shifts to the taxpayer to show that the amount of the assessment is inappropriate. 26 U.S.C. § 7429(g)(2); *DeLauri v. United States, supra* at 446. There is a presumption in favor of the Internal Revenue Service that the amount assessed is proper. *DeLauri v. United States, supra* at 446; *Loretto v. United States, supra* at 1172 n. 7. The Court is not expected to determine the taxpayer's ultimate tax liability in this summary proceeding; that issue may and will be litigated elsewhere. *DeLauri v. United States, supra.*

■ Cross-Plaintiff Alfaro has failed to sustain his burden of showing that the amount of the termination assessment is not appropriate. The evidence shows Alfaro to have been in control of vast amounts of currency being generated from some source. Over a span of a few months, more than twelve million dollars were deposited in a savings and loan in Laredo, Texas, more than six million dollars in the First City National Bank of El Paso, more than two million dollars in the El Paso National Bank, and more than eight hundred thousand dollars in the Bank of Coronado of San Ysidro, California, not to mention the 4.1 million dollars in currency seized on June 22 and 23 in Anaheim, California. These funds add up to more than 25 million dollars. Explanations offered by the taxpayer and his witnesses as to the sources of these funds, to put it conservatively, lack credibility. In short, the Court finds that the amount of the termination

assessments, although large, is not unreasonable or inappropriate in these unusual circumstances.

It is therefore ORDERED that the motion of Cross-Plaintiff Mardoqueo Alfaro for abatement of the termination assessments and the tax liens filed herein be, and the same is hereby, DENIED.